**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| DARLENE G. MITCHELL<br>Plaintiff,<br><br>v.<br><br>CAROLYN COLVIN, Acting<br>Commissioner of Social Security,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br>No. 13 CV 50209<br>Magistrate Judge Iain D. Johnston |

## MEMORANDUM OPINION AND ORDER

Plaintiff Darlene Mitchell brings this action under 42 U.S.C. § 405(g), seeking remand of the denial of social security disability benefits. As explained below, the decision is remanded not because of a specific singular egregious error by the ALJ but rather by several smaller errors. Each error, standing alone, would not be sufficient to remand this case, but, collectively, the errors require remand.

## BACKGROUND

On November 9, 2011, a hearing was held before an administrative law judge ("ALJ"). The hearing was brief. The hearing lasted just 30 minutes. The only two witnesses were plaintiff and a vocational expert. No medical expert was called.

Plaintiff was then 55 years old, single, living in a townhouse with a roommate. She was five feet, five inches tall and weighed 280 pounds and last worked on June 15, 2007. The ALJ asked plaintiff about her ailments. She testified (among other things) that she had breathing problems (using an inhaler and a CPAP while sleeping); carpal tunnel syndrome in both hands; hypertension and borderline diabetes; conjunctivitis in her eyes; and pain coming up her legs from tendonitis and arthritis in her left knee and ankle. R. 50-56.

She testified that she could walk about a block with a cane, but then gets tired and short of breath. She could stand for about 15 or 20 minutes, but then her lower back starts hurting and her knees "want to give out." R. 57. She was a little unsure as to how long she could sit at one time, but she did not believe she could do so for eight hours. She had difficulty climbing stairs, and could lift a gallon of milk if she used both hands. She had difficulty bending, stooping and reaching. Her carpal tunnel made it difficult to reach up and caused her pain when she did so. She could use her left hand better than her right, but she still has some difficulty with the left hand. R. 57-60.

She took a while to get to sleep and usually slept six or seven hours. During the day, she would lay on her bed and watch television. She had a license and occasionally drove. She prepared meals in the microwave, did dishes (although standing caused pain), did laundry, made her bed, swept, and vacuumed. Her neighbors helped her take out the trash. R. 61-63.

The last time she went to church was six months before the hearing. Occasionally, she went to her nephew's Pee-Wee football games. Her sister typically dropped her off close to the gate. She did not have regular access to the internet. Although she had an email account, the last time she looked at it was months before the hearing . R. 63-65.

Plaintiff's attorney then asked questions. Plaintiff discussed how she had worked for many years and liked working and only stopped because of her "shortness of breath and not being able to stand." R. 66. Also, her arms were not able to do the job of a typist. She worked in several different jobs, but her longest stint was for Lucent (and its predecessors), a job she held for 23 years. R. 66-67, 481.

Her attorney asked her how long she could sit still before she would have to start moving around because of the pain. She was not able to give a precise amount of time: "I don't know.

I've never timed it. I try to be still, you know, I try not to [move] because I know it probably irritates other people, [] but I'm used to laying down. That's what I do. You know, at home that's what I do." R. 68. As for sleeping, she does not feel rested when she wakes up and the lack of sleep makes it hard for her to remember things. She has "sudden pains" in her shoulder and numbness in both hands. She feels uncomfortable or in pain or numb all the time, which makes it hard to concentrate. R. 70-71.

The vocational expert testified that plaintiff had worked at Lucent as a telephone order clerk (sedentary, semi-skilled), worked a month at a welding company doing dictation (sedentary, skilled), worked as a sales clerk at Marshalls (light, semi-skilled), and worked at Walgreens (light, semi-skilled). Of these past jobs, the vocational expert concluded that plaintiff could only work one: telephone order clerk. If plaintiff needed to lie down for 20% of the day, then it would eliminate competitive employment.

On February 28, 2012, the ALJ issued her decision. At Step Two, the ALJ found that the following impairments were severe: "degenerative joint disease in left knee and ankle, and degenerative changes in right knee; restrictive lung disease/obstructive sleep apnea; history of carpal tunnel syndrome status post surgery; and obesity." R. 23. The ALJ found plaintiff's back problems, eye problems, hypertension, and borderline diabetes were not severe and that her depression did not meet a Section 12 listing. The ALJ found that plaintiff had the residual functional capacity ("RFC") to do sedentary work: she could "occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl;" she could use her right hand "frequently to handle, finger and feel;" she could "reach overhead frequently with [her] right upper extremity" and the work "must include a sit/stand option to sit 1 hour, stand for 2 minutes." R. 26-27. The RFC does not appear to incorporate any limitations to account for memory problems.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). If the Commissioner's decision lacks evidentiary support or adequate discussion, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Indeed, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

It is important to recognize plaintiff's basis for remand. Plaintiff challenges the RFC analysis, arguing that the ALJ failed to fully consider the combined limitations for several ailments. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) ("An ALJ must evaluate all relevant evidence when determining an applicant's RFC, including evidence of impairments that are not severe."). Consequently, this Court must focus on the consequence of the alleged errors

collectively. However, this Court will consider these arguments individually in the order presented by plaintiff, keeping in mind that the ALJ was required to also consider them collectively.

**Obesity.** Plaintiff first argues that the ALJ failed to consider her obesity. The ALJ discussed obesity in two paragraphs. The first paragraph states the following:

> Social Security Ruling 02-1p provides guidance regarding a diagnosis of obesity in the adjudication of disability claims. This ruling points out that the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately. It points out that obesity is a risk factor that increases an individual's chances of developing impairments in most body systems. It commonly leads to, and often complicates, chronic diseases of the cardiovascular, respiratory, and musculoskeletal body systems. The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

R. 26. Both sides agree that this provision guides the inquiry here. In a later paragraph, the ALJ discussed obesity as it specifically relates to plaintiff:

> With regard to obesity, the claimant participated in treatment at Doctor's Choice Weight Loss beginning September 1995 through March 1997 with an initial weight of 237 pounds and a BMI of 42.8%. Progress notes from February 1997 show her weight was 204 pounds. Medical records from February 2007 document claimant's height at 5'5" and a weight of 270 pounds. Her weight was 265 pounds in June 2008. Progress notes from January 2010 show claimant was 5'5" and weighed 280 pounds. At the physical CE on December 14, 2010, claimant weighed 264 pounds and [was] assessed with morbid obesity.

R. 29 (citations omitted).

In these two paragraphs, the ALJ provided no analysis. The first paragraph is merely the legal standard. The second paragraph merely lists her weight at various times. There simply is no reasoning to reach a conclusion.

In several recent cases, the Seventh Circuit has strongly criticized ALJs for failing to explicitly analyze a plaintiff's obesity. *Goins v. Colvin*, 764 F.3d 677, 681 (7th Cir 2014)

(remanding: "Like most obese people, plaintiff can walk. Her obesity is not disabling in itself. But it is an added handicap for someone who has degenerative disc disease, a narrowed spinal canal, bronchitis, and a Chiari I malformation. Pain and numbness in the legs caused by spinal disease are bound to be aggravated by obesity."). In *Browning v. Colvin*, 766 F.3d 702 (7th Cir. 2014), the Seventh Circuit found a number of errors in the ALJ's analysis, one of which was the failure to analyze obesity. The Seventh Circuit's explanation is worth quoting at length:

> There is more that's wrong with the administrative law judge's decision, including his failure, which continues to be endemic in the Social Security Administration's disability adjudications despite our frequent criticisms of it (most recently in [*Goins*]), to consider the bearing of obesity, even when not itself disabling, on a claimant's ability to work. In determining disability an administrative law judge must consider the *combined* effects of the applicant's impairments. A regulation of the Social Security Administration, 20 C.F.R. § 404.1523, states that "we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." []
>
> The administrative law judge acknowledged that the plaintiff's obesity was a factor in her leg pain, but did not discuss its bearing on her ability to do sedentary work. Remember that she's almost morbidly obese. This might make it difficult for her to sit for long periods of time, as sedentary work normally requires. Presumably she could get up from her work table from time to time, but that might be painful given her obesity—the sheer weight she must lift—and her leg pain, which is aggravated by standing, since standing requires her legs to support her great weight. We don't want to play doctor ourselves; but the likely difficulties that morbidly obese persons (and the plaintiff is almost morbidly obese) face even in doing sedentary work are sufficiently obvious to have required the administrative judge to instruct the consulting physician to consider the potential effect of the plaintiff's obesity on her ability to do sedentary work.

*Id.* at 706-07 (emphasis in original).[1]

[1] In *Browning*, the claimant was five feet six inches tall and weighed 240 pounds, resulting in a body mass index that—as the Seventh Circuit noted several times—was "very close" to the morbidly obese category. 766 F.3d at 704. In *Goins*, the claimant was five feet six inches tall and weighed 250 pounds. 764 F.3d at 679. Here, plaintiff at the time of the hearing was five feet five inches tall and weighed 280 pounds, putting her in the morbidly obese category.

The government acknowledges that the ALJ failed to provide an explicit analysis. But the government argues that this failure was harmless because the ALJ relied on Dr. Karri, who explicitly considered plaintiff's obesity. In some cases, the Seventh Circuit has held that an ALJ's failure to discuss obesity is harmless when "the ALJ indirectly took obesity into account by adopting limitations suggested by physicians who were aware of or discussed [the claimant's] obesity." *Arnett*, 676 F.3d at 593 (citing *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) and *Skarbeck v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). However, in reviewing the pages in Dr. Karri's reports that the government relies on (R. 692, 721), this Court notes that they merely include a listing of plaintiff's current weight, which does not suggest that obesity was explicitly considered. Here, many of the same considerations that the Seventh Circuit discussed in *Browning* are present, such as the possible effect plaintiff's weight may have had on her ability to sit for long periods and also on her ability to alleviate such problems by getting up to stand.[2] It is possible on remand, as the government now suggests for the first time on appeal, that the ALJ will conclude that the limitations due to plaintiff's obesity are already sufficiently accounted for. Perhaps that is so, but on this record, the Court is not so confident that it is willing to apply the harmless error doctrine. If, on remand, the ALJ believes that the RFC's limitations incorporate plaintiff's obesity, then the ALJ should explain her reasoning. *See Arnett*, 676 F.3d at 593 ("If the ALJ thought Arnett's obesity has not resulted in limitations on her ability to work, he should have explained how he reached that conclusion."). Again, the ALJ's erroneous obesity

[2] The Court is a bit uncomfortable coming close to the line of "playing doctor" in this regard. But because the Seventh Circuit asserts that this point is "sufficiently obvious," so its concern is somewhat assuaged. A reader of numerous Social Security appeal decisions may wonder how often the prohibition for even courts to play doctor is seemingly ignored. But again, in conducting this analysis, this Court is merely applying the Seventh Circuit's analysis.

analysis, standing alone, would not be sufficient to require remand. But in conjunction with the other errors identified below, remand is necessary.

**Depression.** Plaintiff argues that the ALJ failed to fully consider her depression. It is undisputed that the ALJ considered plaintiff's depression at Step Two, finding that she had no limitations in the four paragraph B criteria needed for a Section 12 listing. The ALJ found that plaintiff was able to conduct a broad range of daily activities and interacted socially. Plaintiff is not challenging this portion of the ALJ's ruling. [3]

Instead, she argues that the ALJ in the RFC analysis did not account for a specific manifestation of her depression – namely, memory problems. She notes that the two agency psychologists—Drs. Peggau and NieKamp—found she had at least some memory problems.

This Court agrees with plaintiff that the ALJ failed to properly address this issue. In the narrative portion of the ALJ's decision, the entirety of plaintiff's memory problems consists of the following: "[H]er memory seemed intact with respect to immediate and remote recall of factual information and events although she had some problem with the serial 7 test." R. 24.

With regard to plaintiff's memory problems caused by depression, the record is far more compelling. To summarize, in May 2008, plaintiff was interviewed by Dr. John L. Peggau who

[3] The Court notes that the ALJ held that plaintiff had no limitation in daily activities because "she is able to tend to personal care, clean the house, do laundry and sweeping, cook simple meals, shop, handle funds, go to church, read a book, watch television, do Facebook and email, and watch kids play football (Pee-Wee)." R. 25. The evidence suggests that some of the activities were actually performed relatively infrequently. For example, plaintiff testified that the last time she attended church was six months ago. She testified that she has no access to a computer nor any internet connection (not even on her phone) and that "it's been over months" since she last checked her email. R. 63-65. It was unclear whether she ever used Facebook. The only evidence this Court could find was an ambiguous, indirect question which plaintiff may have believed was asking about internet usage in general. R. 65.This Court could find no reference in any of the written forms completed by plaintiff that she used Facebook. With no internet access, it seems unlikely she was doing so on any consistent basis. However, the ALJ twice mentioned plaintiff's Facebook usage to support the ruling.

diagnosed her with dysthymic disorder and rated her GAF as 65. R. 483. He noted that plaintiff was unable to complete the serial sevens subtraction test and was "well below average" in both immediate and delayed recall. R. 482. In December 2010, plaintiff was interviewed by Dr. David NieKamp, who diagnosed her with moderate depression and anxiety and rated her GAF as 50. R. 732. Dr. NieKamp stated that her memory "seemed intact with respect to immediate and remote recall of factual information and events," but at the same time he noted that she had problems with the serial sevens test, which he stated was "likely due to interference from her depression and anxiety." R. 731-32.

Comparing the ALJ's brief mention of memory problems at Step Two with the medical records discussed above reveals a significant conflict. In her summary of Dr. Peggau's report, the ALJ only obliquely referred to the issue, stating only that "[r]eportedly, claimant had memory problems," but omitting that Dr. Peggau found that plaintiff failed the serial sevens test and was well below average in both short-term and long-term memory. R. 24. In her summary of Dr. NieKamp's report, the ALJ acknowledged that he found plaintiff had problems with the serial sevens test, but the ALJ omitted the doctor's explanation that this was attributable to her depression. *Id.* Aside from this summary of the two reports, the ALJ never analyzed the alleged memory problems. Moreover, and importantly, there is no evidence that the ALJ considered or incorporated plaintiff's undisputed memory problems into the RFC.

Nor did the ALJ acknowledged evidence directly from plaintiff. In two Function Reports (Exs. 4E and 14E), reports which the ALJ elsewhere relied on (R. 25), plaintiff stated that she had problems with memory and focus. *See* R. 283 (she "easily forget[s]," "loses focus," is "unable to concentrate," her "mind wanders," and she is "unable to understand some instruction"); R. 221 (she could remember "more things" before her impairment). At the hearing,

she testified that because of her memory problems she has to write things down and that after she leaves the hearing she "may not be able to tell you what you said to me." R. 69-70.

In sum, because the ALJ never explicitly analyzed this issue in determining plaintiff's RFC, the Court cannot be sure that the ALJ fully considered it—or even considered it at all. The Court recognizes that the evidence is varied with Dr. NieKamp viewing plaintiff's memory problems as less serious than Dr. Peggau apparently viewed them. Still, Dr. NieKamp believed that the problem with the serial sevens tests was attributable to her depression, which is the argument plaintiff is now making. As plaintiff points out, the question of her memory is important because the ALJ found that she was able to do semi-skilled work with no limitations. The ALJ failed to build a logical bridge from the evidence in the record regarding plaintiff's memory problems to her RFC. *See Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) ("If the ALJ meant to capture all of [claimant's] . . . problems within this RFC, he has failed to build the 'accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford meaningful judicial review.'").

**Carpal Tunnel Syndrome.** Plaintiff argues that the ALJ failed to fully consider her carpal tunnel limitations. Although the ALJ considered this issue to some extent, the Court agrees with plaintiff that the ALJ did not properly consider the evidence supporting plaintiff.

The ALJ stated in the credibility portion of the opinion: "The claimant had right carpal tunnel surgery but good recovery and full use of the right hand per the consultative physician (Exhibit 20F). There are no documented left hand disorder or limitations of significance per Exhibit 20F and 23F." R. 27. In the RFC portion of the opinion, the ALJ summarized the evidence—specifically, noting that in 2007, electrodiagnostic testing first confirmed that she

carpal tunnel syndrome in both arms, although it was more prominent in the right one; that similar tests were performed in February 2010 showing that there had no improvement; and that she had carpal tunnel surgery on the right wrist in March 2010 followed by physical therapy. R. 28. After summarizing this evidence, the ALJ noted that later in the year, in September and December 2010, plaintiff was seen by the agency's consultative examiner, Dr. Roopa Karri, who noted on one occasion that plaintiff's grip strength was normal and on the other occasion it was 4/5 in both hands. Dr. Karri also noted that plaintiff could make a fist and tie her shoes. R. 28-29. Based on the reports from these two visits with Dr. Karri, the ALJ concluded that the surgery on the right wrist was successful and that plaintiff had no problems with the left wrist.

The ALJ's conclusion fails to acknowledge significant contrary evidence. To start with, plaintiff has consistently complained about the pain, numbness, and limitations in both wrists. In written submissions, she described these problems. *See* R. 229 ("left arm pains all the time [when reaching overhead] and at night it hurts worst, will have to use the right hand to help lift my arm or move it"); R. 277 ("I have to keep my hand down by my waist [when sleeping] to prevent numbness."). At the hearing in November 2011, she testified that she still had numbness and pain in both hands, although the pain in the left arm was not as severe as in the right wrist. R. 70.

Although the ALJ relied on the consultative examiner's reports, the ALJ did not give much attention to the medical records submitted by Dr. Steven Milos, who performed the surgery on her right wrist. In 2010, Dr. Milos viewed the electrodiagnostic tests from 2007 and ordered that they be repeated. The new tests confirmed that that plaintiff still had bilateral carpal tunnel syndrome. Dr. Milos wrote that plaintiff "continues to have symptoms in both hands." R. 580. He also performed in-office tests to confirm the diagnosis, including a nerve compression test

and a test known as Phalen's maneuver. Dr. Milos found that the results for the left hand were "similar" to those for the right hand, and he recommended surgery on both wrists: "We will start with the right side since that is the most severe and then allow her six weeks of therapy before we proceed switch the left." R. 581.[4]

After surgery, plaintiff continued to experience pain in both hands. Eight days after the surgery, plaintiff saw a physical therapist who noted:

> She presents with complaints of pain with a pain scale of 9/10 in the right wrist. She reports sometimes pain goes up to her forearm and shoulder and describes a shooting pain just like a 'thunderous shot' on her fingers. Condition started four years ago and pain aggravated with her work. Condition worsens when keeping her hands up as well. She reports she also had the same condition in the left wrist and still undecided yet if she will undergo surgery.

R. 586. A report a month later indicates some improvement but still pain. R. 585. Unfortunately, at this point, the record does not contain any follow-up visits and there is no objective evidence to confirm, one way or another, whether plaintiff's pain improved. In short, there is no evidence from the records of Dr. Milos that the surgery was successful.

Although the ALJ relied on two reports from Dr. Karri in late 2010 to suggest that the surgery was successful, these reports are not nearly as compelling as the ALJ made them out to be. In both reports, Dr. Karri noted that plaintiff was still reporting pain, numbness, and tingling in both hands, that she felt the surgery did not work because her right hand was "not better," and that she still felt she needed surgery on the left hand. R. 692. Also, in the "impressions" section at the end of the reports, Dr. Karri listed *bilateral* carpal tunnel syndrome as one of plaintiff's ongoing problems. Dr. Karri never indicated in these two reports that she doubted plaintiff's claim that the pain continued in both wrists. It is true that she observed that plaintiff had normal

[4] He also noted that, since 2007, plaintiff had tried conservative treatments such as anti-inflammatories, bracing, exercises, and therapy and that they did not work (the bracing actually making symptoms worse). R. 578.

grip strength on one occasion and 4/5 strength on the other, but Dr. Karri never indicated that this one test meant that the surgery was successful, nor that she doubted plaintiff's claims about pain.[5]

Standing alone, the ALJ's error regarding plaintiff's carpal tunnel syndrome would not be sufficient for remand. However, in conjunction with the other errors, remand is necessary.

**Boils.** Plaintiff argues that the ALJ failed to consider that she had painful boils (sometimes referred to as absecces) in her groin and other areas that caused pain while sitting and that would sometimes burst creating an embarrassing smell and making it harder for her to go to work. To support this claim, plaintiff in her opening brief cited to the following: (i) an undated form completed by plaintiff: "I cannot sit very long because of the boils" (R. 203); (ii) a September 17, 2007 progress note from Dr. Denise A. McGuffin: "BOILS: returned in 7/07. in groin and vaginal area. uncomfortable to sit since then and sometimes hard to walk.") (R. 600); (iii) plaintiff testified that while sitting she must keep moving to avoid pain (R. 58); (iv) a March 24, 2008 form completed by plaintiff: "not able to stand or walk for any length of time and the odor when the [boils] burst – smells" (R. 225); (v) an April 17, 2008 phone interview with plaintiff's sister: "recurrent boils since childhood" which seemed to "have some genetic etiology" and which worsened the last two or three years whereas before they were only episodic (R. 240); and (vi) Dr. Karri's September 9, 2010 report: "Boils in the axillary areas" (R. 694).

The ALJ discussed none of this evidence and, in fact, never mentioned boils or absecces at all in her opinion. The issue also never came up at the hearing. The government argues that the

[5] As noted, Dr. Milos performed a test known as Phelan's maneuver and median compression nerve test. It is not clear exactly what role grip strength plays in the carpal tunnel diagnosis, and how it relates to the diagnostic tests used by Dr. Milos.

ALJ was justified in ignoring this issue because, essentially, plaintiff dropped the ball. At the hearing, the ALJ did not ask plaintiff about her boils, but she did ask the following question:

Q. All right. Is there anything else you want to tell me today?

A. As far as?

Q. Medical problems, complaints, something we didn't touch on?

A. No. Seem[s] like you touched on basically everything.

R. 65-66. Plaintiff's counsel then asked additional questions, but he also never referred to boils, nor did plaintiff ever raise the issue on her own.[6]

In light of these facts, it is hard to fault the ALJ for not discussing the issue. A likely explanation is that the ALJ concluded that even if plaintiff previously had problems with boils, she was not currently experiencing problems. This would not be an unreasonable assumption based on the record. The evidence summarized above suggests that the problem, although potentially serious at times, was episodic and treatable with antibiotics, and plaintiff's evidence all pre-dates the hearing by at least a year.[7] There is also evidence in the record suggesting that the boils may not have been an issue at the time of the hearing. *See, e.g.*, R. 722-23 (Dec. 14 2010 report from Dr. Karri which no longer lists boils in the list of problems and which states: "SKIN: no evidence of rash or neoplasia."); *see also* R. 746. Still, all things considered, it would have been better if the ALJ clarified matters at hearing. The Court recognizes that this ailment, like obesity, is one that is potentially difficult for a claimant to discuss at a hearing. The Court therefore encourages the ALJ on remand to specifically ask plaintiff about them. In sum, if this

[6] After the hearing, plaintiff's counsel (different from current counsel) filed a 17-page brief to the Appeals Council. Ex. 24E. This brief listed at least 18 impairments (R. 338), but insofar as this Court can tell, never once mentioned boils or abscesses.

[7] Plaintiff testified at the hearing that she had a problem sitting, but she never indicated that it was caused by boils.

were the only issue, this Court would not order a remand. But given that the case will be remanded on other grounds, the ALJ should address it explicitly.

**Back Pain.** Plaintiff argues that the ALJ erroneously found that plaintiff did not have a back impairment. The Court finds that the ALJ's explanation is sufficient. The ALJ discussed this issue at Step Two and explained that, as part of an emergency room visit in September 2010, doctors found no problems with plaintiff's back after conducting a musculoskeletal examination. The ALJ also noted that plaintiff had not received treatment or diagnosis of a back disorder.

Plaintiff does not discuss this evidence nor challenge the ALJ's reasoning on these points. Instead, plaintiff points to two earlier pieces of evidence: (i) a statement in a June 2008 report by consultative examiner Towfig Arjmand that plaintiff had reduced range of motion "of some joints, including the knee, ankle, wrist, and lumbar spine" (R. 514) and (ii) a June 14, 2007 CT scan stating, among other things, that there was degenerative change in the thoracic spine (R. 388). There is nothing in these reports, however, suggesting that these observations (which were two years earlier than the evidence relied on by the ALJ) were considered significant by these doctors. For example, Dr. Arjmand did not find that the limited range of motion translated into any significant postural limitations. There is no evidence that any doctor accorded significance to the CT scan, one that was focused on possible lung problems. As the ALJ noted, plaintiff never pursued any treatment nor received any formal diagnosis. For these reasons, the Court finds that the ALJ's failure to discuss this evidence does not support a remand. *See Curvin v. Colvin*, 778 F.3d 645, 650 (7th Cir. 2015) (the ALJ does not have to discuss every piece of evidence in the written opinion).

**Credibility Determination.** Plaintiff finally argues that the ALJ's credibility determination is "indecipherable," and "cryptic." The ALJ stated, generally, that plaintiff's

testimony was “credible but not persuasive.” R.27. The ALJ then referred to several issues, including that plaintiff started using a cane recently but that it was not prescribed, that the treatment for her joint pain was over-the-counter Tylenol, and that there was no documentation that she had a left hand disorder.

This Court agrees with plaintiff that this explanation is not clear. Indeed, the Court has given a great deal of thought as to what the ALJ could have meant by stating that plaintiff was “credible but not persuasive.”[8] At a basic level, this Court cannot tell whether the ALJ believed plaintiff’s testimony. On the one hand, the ALJ stated that her testimony was credible. But then the ALJ cited to certain facts—such as the “recent” use of a case—suggesting she may have believed plaintiff was exaggerating her limitations. This makes it difficult to tell whether, and to what extent, the ALJ discounted her testimony (and if the ALJ discounted the testimony, why she would say plaintiff was credible). The ALJ also stated in this credibility discussion that there was no documented disorder of the left hand. R. 27. However, as discussed above, this conclusion is not supported by the evidence from Dr. Milos. A mistaken belief about the facts cannot serve as a basis for an adverse credibility determination. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ’s credibility determination “misstated some important evidence and misunderstood the import of other evidence”); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on “errors of fact or logic”).

* * *

[8] If this phrase were contained in a discussion going to the weight of the evidence, then one could read this phrase to mean that the ALJ believed plaintiff (i.e., she was credible) but even believing the testimony, plaintiff had not met her burden of proof (i.e., she was not persuasive). But because this phrase is specifically located in the discussion of credibility, the phrase is nonsense. If plaintiff were “credible,” then she was believable, which would make her persuasive.

To conclude, the RFC analysis on remand should consider all these issues in combination. Plaintiff's testimony is central to these issues. This is not a case where there is one clear ailment. Plaintiff's case rests more on the accumulated impact of multiple ailments and whether she could, even with a sit-stand option of one minute every hour, consistently sit and concentrate for eight hours in a semi-skilled job and also whether she could regularly show up for work. Her testimony on these points was not always clear. Specifically, it was not clear how long she could sit, whether her weight would make the sit-stand option feasible (a concern the Seventh Circuit raised in *Browning*), and whether she would need to lie down for any significant periods. In both her testimony and written submissions, she stated that she spent good portions of the day lying down. It is not clear whether this was by choice or was to alleviate pain. *See* R. 61 (stating that she lies down during the day "[b]ecause I get tired of sitting up"). Given that the vocational expert testified that she could not work if she had to lie down 20% of the day, this is an issue that should be also be addressed on remand.

## CONCLUSION

For all the above reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further proceedings.

Date: September 8, 2015

By: ______________________________

Iain D. Johnston
United States Magistrate Judge